Anna **PHILLIPS**, Administratrix of the Estate of John Phillips, Deceased, Plaintiff-Respondent,

v.

**UNION ELECTRIC COMPANY,** a corporation, Defendant-Appellant.

No. 30707.

St. Louis Court of Appeals.
Missouri.
Oct. 17, 1961.

William H. Ferrell, Keefe, Schlafly, Griesedieck & Ferrell, St. Louis, for appellant.

Morris E. Stokes, Burton H. Shostak, Moser, Marsalek, Carpenter, Cleary, Jaeckel & Hamilton, St. Louis, for respondent.

BRADY, Commissioner.

This case comes to the writer upon reassignment. The respondent, mother and administratrix of the estate of her deceased son, brought this action for wrongful death against the Union Electric Company, hereinafter referred to as the appellant. Trial resulted in verdict and judgment for respondent in the amount of $15,000. We have jurisdiction of this appeal, §§ 3, 13, Article V, Constitution of Missouri, 1945, V.A.M.S.; Section 477.040 RSMo 1959, V.A.M.S.

■ There is only one point presented for our determination. Respondent pleaded and tried her case upon the theory of res ipsa loquitur. The appellant stood upon its motion for a directed verdict offered at the close of respondent's case, and assigns as error the trial court's refusal to grant that motion. We will confine the statement of facts to those pertinent to appellant's assignment of error, and we will take the evidence in the light most favorable to respondent, giving her the benefit of all reasonable inferences to be drawn therefrom. Reddick v. City of Salem, Mo.App., 165 S.W.2d 666, at loc. cit. [2], page 670; Boese v. Love, Mo., 300 S.W.2d 453.

At the time the accident took place, the deceased was on the outside of the building, standing on the cornice with his hand on the window frame and his right shoulder in the vicinity of the scaffolding. His brother, who was working with him, was inside the building about one or two feet away from the window with his back to the window getting some material when he heard the deceased grunt and holler "Oh." He turned toward the deceased and saw that his hand was on the window, that he was grunting, moaning and starting to slip. When he grabbed for the deceased, he received an electrical shock which shortly wore off and he grabbed hold of the deceased again. By this time, another workman who was helping the brothers arrived at the window and as-

sisted in pulling the deceased into the building. The time of death is not exactly known, but the deceased died a short time after being pulled in through the window.

The pathologist who examined the deceased found post mortem lividity and cyanosis, bulging of the veins about the neck, a roughly rectangular burn or mark which went through the superficial layers of the skin over the right shoulder scapular region, and a fresh linear burned area fairly deep through the skin on the right forearm. He also found fluid in the lungs and gave as his expert opinion that death resulted from electrocution. The physician also testified that there was no way of determining whether the burns were from electrical or other sources, and that he did not find burns on the feet of the deceased or on his hands.

■ The deceased was a carpenter and on the date of his death was engaged in the installation of aluminum frame windows in a building in the City of St. Louis. The installation of these aluminum frames required work to be done both on the outside and inside portions of the building wall. At the time of the accident in the evidence the deceased was doing the outside work and his brother, also a carpenter, was doing the inside work. They were working on one of the third story windows at about the middle of the building as it fronts on Sarah Street in the City of St. Louis. A metal scaffolding had been erected to facilitate this work. This scaffolding was about five feet wide and extended a few feet above the third floor, and abutted a copper covered cornice which extended along the building at that place at about the third floor level. This cornice was one and a half feet wide, approximately, and therefore the outside edge of the scaffolding was about six and a half feet from the building wall itself. The appellant maintained utility poles and electric wires along the frontage of the building, and since it appeared that the

outside edge of the scaffolding would be close to one of the wires, the deceased's employer requested the appellant to change its facilities in order to provide ample clearance for the scaffolding. The appellant sent a crew out to the scene and certain wires were removed and relocated about five days before the accident. The 2400-volt circuit maintained by the appellant along the Sarah Street frontage of this building included four wires: the A phase, which was furthest from the building; the B phase; a neutral wire; and the C phase, which was closest to the building. These lines stretch between the north pole, which is referred to as the alley pole in the evidence and which was located about one foot north of the north line of the building at the edge of an alley, and the south pole which was some distance to the south and opposite the building in the parkway between the sidewalk and the street. The cross-arms on the northern pole were ten feet long and being centered on the pole extended approximately five feet to each side. The cross-arms on the south pole were six feet long and thus extended three feet to each side of the pole. Whereas the bottom of the pole, that is, where the pole entered the ground, was approximately ten feet west of the building, it is clear from the exhibits that the alley pole leaned inwardly toward the building, but just how far it leaned out of vertical is not stated in the evidence. The C phase wire, the one closest to the building, was cut by the appellant's crew, rolled up and hung on a step about halfway up the south pole. That left the neutral wire closest to the building, and although it was an unenergized wire, it was moved from the cross-arm away from the building toward the pole. The B phase wire was then cut and hung in a rope sling between the two poles. That left the A phase wire as the only energized wire remaining between these two poles, and the evidence most favorable to the respondent is that it was six feet away from the scaffolding. The respondent places great emphasis upon the lines

running northwardly from the alley pole. These wires were not changed by the appellant's crew. Plaintiff's Exhibits 9, 11, and 13 showed the north utility pole with these wires being attached to the top cross-arm of a double cross-arm. On the date of the accident, it is shown by the evidence that there was another cross-arm about a foot higher located on this pole, but these lines were as shown in the exhibits although at the time of the accident they were attached to the single cross-arm that was then at the top of the alley pole. The testimony given by the appellant's foreman in charge of this work was that these lines would be about a foot north of the edge of the building.

There were no electric wires located in the wall against which the scaffolding was placed. The employees of appellant came out to the scene of the accident the day after it occurred and made some tests which, along with those made by the maintenance man for the building, showed no current in the wall, scaffolding, the radiator, or the window frame.

There was a great deal of testimony given regarding an electric drill and whether or not it was defective. Appellant also placed emphasis upon the presence of this drill and its alleged defectiveness in its brief and argument before us. However, as has been heretofore stated, we are constrained to take the evidence in the best light to respondent, and although the brother of decedent admitted on cross-examination that he had told the police officer investigating the accident that he was using the drill at the time the accident occurred and had further testified at the coroner's inquest that about twenty minutes before the accident occurred he had been using the drill and got a "jolt" from it, he testified at the trial that he was not using the drill at the time of the accident and that neither was the decedent. The brother further testified that actually the day he received the shock was not the same day of the acci-

dent, and that there were several drills being used and he did not know which one he received a shock from. The brother of decedent did not testify as to the location of the drill when the accident occurred. The building maintenance man testified that a drill was laying on the floor at the time of the accident but it is obvious from his earlier testimony that he was not present at the time of the actual occurrence, that the witness was referring to the location of the drill when he arrived at the scene of the accident, a few minutes after it had occurred. The respondent's expert witness testified that the drill would have to come into actual contact with the aluminum window frame in order for such a drill, operating off of ordinary current, to either shock or electrocute anyone. Taking the facts in the light in which we must view them, Boese v. Love, supra, we will consider the drill as not being in use at the time of the accident nor as being able to have caused the accident. Moreover, it clearly appears from the testimony of decedent's brother that the decedent did not have any tool, electrical or otherwise, with him at the exact time of the occurrence which resulted in his death.

The respondent's expert witness gave as his opinion in response to a hypothetical question that the appellant's wires were the most likely source of the current that caused the death of decedent. The further effect of his testimony was that while burns such as those found upon the decedent cannot be determined to have been caused by electricity or some other source, he did not believe that this type of burn would be produced by the current used to operate a drill, but by substantially greater current. He further testified that if the cornice of the building became charged with electricity, and if a person was standing on it and came in contact with the scaffolding, this would establish the conditions for electric shock. On cross-examination, the witness testified that his opinion concerning the most likely source

of electricity causing the death as being the appellant's wires was based upon an assumption that the wires actually contacted the scaffolding or cornice or that some conducting material was inserted between those lines and the scaffolding or cornice and that in the absence of the existence of one or the other, or both, of those conditions, it would be impossible for the defendant's lines to have caused this accident. He further testified that the maximum distance electricity could jump or arc from the 2400-volt conductor under the conditions existing at the time of the accident was one-fourth inch. He further stated upon cross-examination that there were a considerable number of instances where people have been electrocuted by contact with 110 volts.

As might be expected, the parties are in agreement upon the fundamental rules defining the scope and limitations of the res ipsa loquitur rule. Both parties cited McCloskey v. Koplar, 329 Mo. 527, 46 S.W.2d 557, 92 A.L.R. 641. As was said in Sleater v. John R. Thompson Co., Mo.App., 173 S.W.2d 591, at loc. cit. page 592, these rules as stated in McCloskey are as follows:

> "In general and on principle the doctrine res ipsa loquitur does not apply except when (a) the occurrence resulting in injury was such as does not ordinarily happen if those in charge use due care; (b) the instrumentalities involved were under the management and control of the defendant; (c) and the defendant possesses superior knowledge or means of information as to the cause of the occurrence."

We need not consider the presence or absence of (b) or (c) for as this court pointed out in the Sleater case at page 592 [2] of 173 S.W.2d, when discussing (a), " * * * the accident and its surrounding circumstances must identify the defendant as the wrongdoer whose negligence was the proximate cause of the acci-

dent * * *." It is in this respect that appellant contends and we hold respondent failed to make a case. The unusual result of the factual situation present in this case, when considering the facts in the light in which we must view them, is that the evidence is undisputed that the deceased died of electrocution and that the only electricity that was in use at the time that would kill him was that carried by the appellant's lines going northwardly from the alley pole and coming within a foot of the cornice of the building, yet at the same time the respondent's own evidence, given by his own expert witness, is that this source of electricity could not have caused the death absent either or both of two conditions. These are the touch of the appellant's lines against the scaffolding or cornice, or the insertion of some conducting material between the appellant's lines and the scaffolding or cornice. However, neither of these conditions was shown in the evidence to exist at the time of this accident nor is there even one iota of testimony as to them from which their existence can reasonably be inferred. The nearest that any line came to the scaffolding or cornice was one foot, and there is no evidence that there was a wind or that the line sagged or swayed nor that it in any other manner could move this distance so as to touch the scaffolding or cornice. Moreover, the testimony of the respondent's expert was that current would not jump from this line to the cornice over this distance, and would not jump more than one-fourth inch. Under these conditions there is no way to reasonably infer that the line touched the scaffolding or cornice. In like manner, the testimony of the brother of decedent was that the decedent had no tools with him as he stood outside the window, nor is there any evidence as to any material being outside the window that could have served as a conductor between the appellant's lines and the scaffolding or cornice. Accordingly, there is no basis for any reasonable inference that current reached the scaffolding or cornice from

the appellant's lines through some conducting material. The end result is that we are confronted, under the factual situation as we must take it, with a case where we are required to believe from the evidence that the only source of the electricity that could have caused decedent's death was appellant's lines, and at the same time the testimony is that same source could not have done so. Under such circumstances, we do not believe the accident and its surrounding circumstances can be said to show or identify the appellant as the wrong-doer whose negligence was the proximate cause of the accident. As has been stated in a recognized text work on the subject, Shearman and Redfield on Negligence, Revised Edition, Vol. I, § 56 at page 149, the rule of res ipsa loquitur relates to the probative force of evidence. The doctrine is not an arbitrary rule, but is rather a common sense appraisal of the probative value of circumstantial evidence and is a rule of reasonable inferences. We do not think there can be any reasonable inference in this case to allow respondent's theory that appellant's lines caused decedent's death, in view of the testimony of respondent's own expert witness that the lines could not do so absent the existence of other circumstances which are not shown to have existed, or testimony to allow the inference of their existence. Neither can the respondent be heard to say that the jury could disregard that part of her own expert witness's testimony to the effect that appellant's lines could not have caused the decedent's death absent the presence of two factors not shown by the evidence nor arising as a reasonable inference therefrom. Where a party offers testimony of a witness, he vouches for the credibility of such testimony and is bound thereby if it stands uncontradicted by other testimony or by facts from which the jury might draw a contrary inference. Draper v. Louisville & N. R. Co., 348 Mo. 886, 156 S.W.2d 626, [11, 12] at page 627. See Missouri Digest, Evidence, ⊕591. More-over, when the subject is one within the knowledge of experts, undisputed expert testimony which is based on scientific processes, methods, or knowledge is to be accepted as conclusive by the trier of the facts. 32 C.J.S. Evidence § 569, page 399.

It follows that the trial court prejudicially erred in overruling appellant's motion to dismiss, and that the judgment should be reversed. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion of BRADY, C., is adopted as the opinion of the court. The judgment is reversed.

RUDDY, Acting P. J., WOLFE, J., and GEORGE P. ADAMS, Special Judge, concur.

ANDERSON, P. J., and DOERNER, C., not participating.