Vickey Lou YOUNG, by her Next Friend, Orrin Gee, Respondent,

v.

MISSOURI PUBLIC SERVICE CO., Appellant.

No. 50016.

Supreme Court of Missouri,

Division No. 1.

Jan. 13, 1964.

Poague, Brock & Wall, Barkley M. Brock, Julius F. Wall, Clinton, for appellant.

William J. Cason, Harold L. Caskey, Clinton, Paul Cisel, Windsor, for respondent.

COIL, Commissioner.

Vickey Lou Young, an infant, through a next friend, claimed $25,000 as damages from Missouri Public Service Company for the alleged wrongful death of her father. A jury awarded her $20,000 and defendant appealed from the ensuing judgment. We shall refer to the parties as they were designated in the court below.

Defendant contends that plaintiff failed to make a submissible case, that the trial court erred in giving instructions and in permitting allegedly improper jury argument by plaintiff's counsel, and that the judgment is excessive.

Plaintiff submitted her case under the res ipsa loquitur doctrine. In determining whether she made a submissible case we state and consider the evidence from a standpoint most favorable to her.

Defendant owned, maintained and controlled a series of 35-foot high creosoted poles located on the west side of the main street of Green Ridge in Pettis County. At the top of each of such poles, including, of course, the particular pole in question, was a crossarm eight feet in length. Six to eight inches from each end of that crossarm was an insulator and attached and running from pole to pole was an uninsulated wire; the two wires (one at each end of the crossarm) were known as the "primary" line or lines. That line carried 7200 volts of electricity. Four or five feet below the primary line was a single wire carrying voltage for the operation of a street-lighting system in Green Ridge. That wire was energized only after dark. Three feet below the street-light circuit wire were three wires known as the "secondary" system. Two of those wires each carried 110 volts and the middle wire carried no current and was known as a "neutral." About three feet below the three wires forming the secondary system was a telephone wire which ran from a telephone pole on the east side of the street across the street to a bracket or "stob" on the side of the light pole and thence into a house directly west of that pole. There was a No. 6 soft-drawn copper wire which ran from the top of the light pole down its side to the ground at its base. The neutral in the secondary system was tied to that copper wire. Both of those wires would conduct electricity, as would the creosoted pole.

About 10 o'clock in the morning on October 26, 1956, Billy Young, plaintiff's decedent, and James Riggs, both employees of a telephone company, went to Green Ridge for the purpose of tightening some telephone wires. The day was clear, dry, and warm. Riggs and Young disconnected the telephone wire at the pole on the east side of the street intending to put back that same line and tighten it. Apparently, as Riggs was beginning to reconnect the wire to the pole on the east side, the wire broke at a place about two feet from where it was connected to the light pole on the west side of the street. The wire in question was 14-gauge iron which bent easily and had little spring to it. Young, in order to remedy the situation, obtained a coil of wire and some tools from their truck and put the wire coil on the ground, either at the base of the telephone pole on the east or at the base of the light pole on the west side of the street (the evidence is not clear as to which, and it is unimportant). Riggs, who had remained on the telephone pole on the east side of the street, was, in the meantime, still working on the tightening of other lines and consequently did not continue to watch Young but he, Riggs, did hear the wire "paying out on the spool down there." Shortly thereafter Riggs heard Young "holler 'Jim'" and there was a loud noise which came from the pole on which Young was working and which was identified as a noise which was made by the arcing of electricity from a 7200-volt line. Riggs looked toward Young, saw him apparently trying to push away from the pole, whereupon Young's metal climbing spurs "kicked out" and he slid down the pole to the ground with his safety belt still intact around the pole. The safety belt was leather with some metal rivets in it. Riggs ran to Young, calling for help as he went.

Defendant had a crew working some distance south, 1½ blocks or more away, and the foreman and members of that crew also rushed to the pole. Young was removed from the base of the pole. Tied

to his safety belt was a piece of the old telephone wire four or five feet long. The coil of wire which Young had removed from the truck and which was on the ground and from which Riggs had heard wire uncoiling was never found although a search for it was made, but not until about an hour after the ambulance had removed Young's body. The topmost spur mark made by Young's metal climbers was 18 feet above the ground and thus 17 feet below the 7200-volt line. When Riggs saw him, Young's head was about 10 feet below the primary line. There were no burn marks on the primary line, the street-light line, or on any of the wires forming the secondary, and there would have been burn marks on those wires if another wire had come in contact with any of them. Likewise, there were no burn marks on the short piece of wire which was attached to the decedent's belt. Young had a severe burn on his left hand and left thumb and what appeared to be burns on his back about midway between his shoulders and waist and what appeared to be a burn on his left hip.

There was evidence that there were trees under the lines in question, some of the limbs of which were as high as the primary wires. The evidence showed further that one of defendant's work crews was at the time of the casualty engaged in installing street lights in Green Ridge. They were working a short distance (about 1½ blocks) south of the pole in question. The crew was hanging new lights across a street and they had to string wire. The foreman was hooking up the neutral to the street-light circuit. They were working within four feet of the primary wires. One of the workmen nearest the pole in question heard a loud noise—a high voltage flash which came from a 7200-volt line. There was no other 7200-volt line in the entire area.

■ The res ipsa loquitur doctrine in Missouri applies when "(a) the occurrence resulting in injury was such as does not ordinarily happen if those in charge use

due care; (b) the instrumentalities involved were under the management and control of the defendant; (c) and the defendant possesses superior knowledge or means of information as to the cause of the occurrence. Clark v. Linwood Hotel, 365 Mo. 982, 291 S.W.2d 102, 104–105; and McCloskey v. Koplar, 329 Mo. 527, 46 S.W.2d 557, 559, 92 A.L.R. 641." Layton v. Palmer, Mo., 309 S.W.2d 561, 564 [2], 66 A.L.R.2d 1242, and see Glasco Electric Co. v. Union Electric Light & Power Co., 332 Mo. 1079, 61 S.W.2d 955, 957[1, 2].

It was established that Billy Young was electrocuted. Defendant concedes that the electricity which killed him came from the 7200-volt primary wires at the top of the pole on which Young was located at the time, as is shown by this language in defendant's brief, "The facts were such in this case that it was conclusive that Young received the 7200 current in some manner and it was eight feet above him." No citation of authority is necessary to support the proposition that a jury reasonably could have found that electricity escaping on a dry, clear day from primary wires carrying 7200 volts, down a pole or through a wire or wires, and into the body of a telephone repairman on the pole who had not come in contact in any manner with the primary wires or any of the others, was an occurrence which does not ordinarily happen if those in charge use commensurate care.

■ Certainly the instrumentalities involved were under the management and control of the defendant. The "management and control of the defendant does not mean, or is not limited to, actual physical control, but refers rather to the right of control at the time the negligence was committed." McCloskey v. Koplar, 329 Mo. 527, 46 S.W.2d 557, 560 [2], 92 A.L.R. 641. Defendant admits it had control of the primary lines, but suggests that it did not have exclusive control of the pole because Young was working thereon. But defend-

ant concedes in its brief that the telephone company for whom Young worked had been given permission to use the pole and for its men to climb the pole. It seems obvious, therefore, that even if the pole, as such, was part of the instrumentality involved, rather than only the electric wires on the pole, the defendant demonstrated that it had the right to control its own pole by the very fact that it gave permission to the telephone company to use that pole. There was no evidence that the presence of the decedent interfered with or affected defendant's exclusive right to manage and control the instrumentalities involved.

There is no contention that defendant did not possess superior knowledge or a superior means of obtaining information as to the cause of the occurrence than did plaintiff.

It seems clear, then, that the facts of the present case, stated favorably to plaintiff, bring it surely within the applicable principles of res ipsa loquitur and that plaintiff made a submissible case.

Defendant argues, however, that only by piling inference upon inference may it be said that there is a submissible case; that decedent could not have been injured except by his own negligence and that there was no "connection between defendant and the immediate cause of the injury." We think defendant has failed to give recognition to the fact that a "jury may believe all of the testimony of any witness or none of it or may accept it in part and reject it in part, just as the jury finds it to be true or false when considered in relation to the other testimony and the facts and circumstances in a case." Kickham v. Carter, Mo., 314 S.W.2d 902, 905 [1]. It is true that defendant's evidence was to the effect that, irrespective of how and whether 7200 volts of electricity got into the creosoted pole or the ground wire or both, such could not have harmed Young because his body would not have been part of a ground and the electricity would have followed the copper ground wire or the pole or both, unless Young contacted the primary wires; that the only way Young could have been electrocuted by electricity coming from the 7200-volt primary line was by coming directly in contact with those wires or by some appliance or wire in his possession coming in contact with those wires, in either of which events the electricity would pass through his body and almost certainly kill him. The jury did not need to believe that evidence. On the contrary, the jury reasonably could have found, and apparently did, that deceased was electrocuted by electricity which arced from the 7200-volt primary line on the pole in question; that decedent Young and no part of his equipment, including any wire in his possession or on his person, contacted the primary wires or any other wires on the pole; and, if so, the jury was justified in finding from those facts that the electricity which caused Young's death had to have been transmitted from the primary line to the pole or the ground wire and then to decedent, else he would not have been killed. Such a conclusion was supported by the evidence and it could have been reached without indulging in any presumption.

The jury apparently having so found, it follows, as is conceded by defendant in its brief, "that if there was electricity in the pole or the ground wire and it electrocuted Young, then plaintiff did not have to prove how it got into the pole or the ground wire." We have pointed out above that plaintiff was electrocuted by electricity which had to be in the pole or the ground wire (provided decedent did not come in contact with the primary line and the jury found he didn't), else he would not have been electrocuted by current from the 7200-volt primary wires. We agree with defendant that under those circumstances plaintiff did not need to prove how the electricity got into the pole or the ground wire. Plaintiff did adduce some evidence which showed some possibilities: one, that green tree limbs act as conductors of electricity; that there was a breeze that day; that limbs could have touched the pri-

mary wires and conducted the electricity down to the neutral which, in turn, could have conducted it to the ground wire on the pole in question; another, that the defendant's crew in working on the electric light system in close proximity to the high voltage line, in some manner dropped a copper wire over the primary line through which the electric current was conducted to the neutral and into the copper ground wire on the pole to which the neutral was connected. And, of course, as defendant suggests, the creosoted pole was itself a conductor and was within inches of the primary line.

The cases cited by defendant state well-established principles of law with respect to the application of the res ipsa loquitur doctrine. All of those have been considered and applied in reaching the conclusion that plaintiff made a submissible case. The only case defendant has cited which is factually similar to the present one is Phillips v. Union Electric Co., Mo.App., 350 S.W.2d 432. This portion of the court's language, holding that plaintiff there did not make a submissible case, clearly distinguishes that case from this one: " * * * the evidence is undisputed that the deceased died of electrocution and that the only electricity that was in use at the time that would kill him was that carried by the appellant's lines going northwardly from the alley pole and coming within a foot of the cornice of the building, yet at the same time the respondent's own evidence, given by his own expert witness, is that this source of electricity could not have caused the death absent either or both of two conditions. These are the touch of the appellant's lines against the scaffolding or cornice, or the insertion of some conducting material between the appellant's lines and the scaffolding or cornice. However, neither of these conditions was shown in the evidence to exist at the time of this accident nor is there even one iota of testimony as to them from which their existence can reasonably be inferred." 350 S.W.2d 436.

Defendant contends that for various stated reasons the trial court erred in giving plaintiff's instruction 1. Some of those reasons are a repetition of arguments heretofore made to sustain defendant's contention that there was no submissible case and we need not mention them further. Additionally, defendant says that the instruction did not require a finding that defendant was in exclusive control of the pole. The instruction required that defendant "had exclusive control over the said 7,200 volt electric current and the wires and insulators to the wires over which it was being carried" and that deceased as an employee of the named telephone company "by reason of such employment was required to be and work on the pole mentioned in evidence." We have heretofore referred to the admission in defendant's brief that the telephone men were given the right to climb the pole. Defendant's right to control the pole was not controverted; and even if the pole was part of the instrumentality (which we doubt), the omission from the instruction of a specific finding as to control of the pole was not in any respect detrimental to the defendant. The vital instrumentality, the control of which the instruction hypothesized, was the 7200-volt electric current and the wires and insulators over which it was being carried.

Defendant objects to the instruction because it used the words, defendant "permitted and caused the 7,200 volt electric current aforementioned to leave and escape the wires over which it was supposed to travel, * * *." We are not sure we follow the argument but, as we understand, it is that inasmuch as there was no evidence that defendant did any affirmative thing to cause the electricity to leave and inasmuch as the word "permitted" preceded the word "caused," the meaning and effect of the word "caused" was lessened so that the jury could find defendant liable by finding only that it permitted the current to escape. The language used in the instruction, "permitted and caused the 7200 volt electric current aforementioned to leave and escape the wires over which it was supposed to travel,"

appears to us to have been wholly adequate and unobjectionable.

Defendant next contends that the court erred in refusing to give its instruction No. DD which would have told the jury that it was not permitted to base a verdict entirely and exclusively on surmise, guesswork and speculation, etc. This court has often suggested that such an instruction is not recommended in a circumstantial evidence case, McCormack v. St. Louis Public Service Co., Mo., 337 S.W.2d 918, 919, 920, and the instruction was cautionary in nature so that defendant was not entitled to it as a matter of right, and its refusal was a proper exercise of the trial court's discretion, Hughes v. Terminal R. Ass'n of St. Louis, Mo., 265 S.W.2d 273, 281 [8, 9].

Defendant complains of three rulings of the trial court during the argument of plaintiff's counsel. Two of those are involved in the following portion of the record during which plaintiff's counsel was making an argument directed to the extent which the given instructions required the plaintiff to go to prove exactly what happened.

"[Plaintiff's counsel]: * * * Why, how can she. How could anyone—any person, going down the street and leaning against a light pole and getting electrocuted. The light company says, 'Well, the electricity can't go down the pole and kill you and you can't show what happened.' That isn't the law. The law is that if you are transporting high voltage electricity, that it is silent and can go along—that nobody can watch it and see what happens to it— that if it escapes, then, regardless of how it happened, you are liable; and they are liable, here, because you know—

"[Defendant's counsel]: Object to that improper statement to this jury and ask that the jury be discharged.

"[Plaintiff's counsel]: —for the charged wire; they are liable for this wire; somehow this electricity escaped down that—

"THE COURT: The motion to discharge the jury is denied.

"[Defendant's counsel]: I ask that the jury be instructed to disregard that argument.

"[Plaintiff's counsel]: I'll say it a little different way, it will be right.

"If you find where—under the Instructions—that in any way, whatever it is, they permitted and caused this electricity to escape into Billy Young's body, then, they are liable. If you find in any manner, and we don't have to show you how. The Court has said that if they allowed the electricity to get into Billy's body, then—

"[Defendant's counsel]: I think that is a misquotation: 'Caused and permitted' and the term 'allowed,' now, that is not the law.

"THE COURT: I'm sure they will have the Instructions and they will read them.

"[Plaintiff's counsel]: As far as the wires, they allowed and permitted—

"[Defendant's counsel]: May I make an objection because the Instruction says 'If the defendant caused and permitted,' and Mr. Cason is changing that to 'permitted,' and part of the time, 'allowed,' and there is a lot of difference, 'caused and permitted' or 'allowed.'

"THE COURT: I'm sure the jury will read the Instructions.

"[Plaintiff's counsel]: I think I have a right to say what I am saying.

"If they permitted or caused, in any manner—and I don't have to find out how— the Court has told you that you are to bring in a verdict for the young lady.

"The inference arises: If the electricity gets out. I say to you that I think you should find under the evidence that it did get out, then, the Court says—there is an inference that you might find that they were negligent. High tension electricity doesn't ordinarily get out unless somebody

is negligent. You have got to use care in using it, that is what the Court said to you."

■ It is apparent from the foregoing that defendant has preserved nothing for our review, for the record demonstrates that in both the cited instances defendant's counsel was apparently satisfied with the manner in which each incident terminated and did not seek any further relief.

The third incident is shown by this portion of the record:

"[Plaintiff's counsel]: * * * This is the only day in Court that young lady has; there isn't any more. I know this case has been one day to you people and one day out of your life, but it is a big day in her life. She doesn't know it, sitting over there, but it is this day, where she gets some money—from Mr. Brock, sympathy. We are not asking for sympathy, gentlemen; she has already got all the sympathy that will do her any good. She needs some money that will do some—

"[Defendant's counsel]: I object; improper, she needed—the remarks: 'She needs some money,' and I ask the jury be discharged.

"THE COURT: The Motion to discharge the jury will be denied.

"[Plaintiff's counsel]: I feel, she is entitled to it—for money—to take the place of the father that she had."

■ As pointed out by plaintiff, counsel's statement was not finished prior to the motion to discharge the jury. But in any event, we think the argument was a proper one. As we understand, counsel told the jury that the infant plaintiff did not need sympathy but needed money to, in a measure, make available material things her father otherwise would have provided.

■ Defendant contends finally that the judgment is excessive. The assignment in that respect in the motion for new trial was that the "verdict is excessive and is solely the result of the bias passion and prejudice of the jury and is not supported by any relevant evidence of probative value." To urge that a verdict is so excessive as to indicate passion and prejudice and misconduct on the part of the jury is quite different from averring that the verdict is excessive; and one does not include the other. Taylor v. St. Louis Public Service Co., Mo., 303 S.W.2d 608, 612 [7–9]. Considering the new trial assignment as one charging that the verdict is excessive, we think there is no merit in defendant's contention.

Plaintiff's decedent was just under 19 years of age, a healthy, vigorous young man, at the time of his death. Plaintiff was born after his death. The evidence was that he made $1.13 an hour, or an average monthly income of about $225. He left a widow who did not file the suit within six months. Defendant's position is that if the $2700 annual income were divided equally among the father, mother, and child, each would have received about $800 per year net, and that, consequently, the total the infant plaintiff would have received by the time of her majority would have been less than $20,000. The fallacies in such an argument are apparent, but one decisive reason why the contention is unsound is that it is most probable that plaintiff's decedent's annual income would have exceeded $2700 per year during many of the years of plaintiff's infancy. No jury could predict with certainty what the probabilities were in that respect nor precisely fix plaintiff's pecuniary loss, but the jury's $20,000 award was amply justified.

The judgment is affirmed.

HOUSER and WELBORN, CC., concur.

PER CURIAM.

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.