Erwin L. LOWES and Mrs. Erwin L. Lowes, His Wife, Plaintiffs-Respondents,

v.

UNION ELECTRIC COMPANY, a Corporation, Defendant-Appellant.

No. 32235.

St. Louis Court of Appeals.

Missouri.

June 14, 1966.

Motion for Rehearing or for Transfer to Supreme Court Denied July 13, 1966.

Application to Transfer Denied Sept. 12, 1966.

———◆———

William H. Ferrell, Keefe, Schlafly, Griesedieck & Ferrell, St. Louis, J. W. Thurman, Thurman, Nixon, Smith & Howald, Hillsboro, for appellant.

Earl R. Blackwell, Hillsboro, for respondents.

CLEMENS, Commissioner.

This appeal challenges the sufficiency of plaintiffs' evidence to make a submissible case. The plaintiffs, husband and wife, had spent four years building a new home. When almost completed, it was destroyed by a fire which they attributed to defendant's negligence. Plaintiffs pleaded and submitted their case on the dual theory that the defendant had negligently maintained its wires and the attachment thereof to plaintiffs' house and had negligently maintained a defective transformer. The defendant stood on its motion for a directed verdict. Plaintiffs got a $15,000 verdict and judgment, from which defendant appeals. The core of the controversy is plaintiffs' contention that the fire was caused by a defect in defendant's electrical equipment.

In reviewing the sufficiency of plaintiffs' evidence we follow the principles that they are entitled to all reasonable inferences arising from the circumstances shown, that the precise injury complained of need not have been foreseen if the injury was the natural and probable consequence of an act or omission of the defendant, and that plaintiffs are bound by the uncontradicted testimony of their own witnesses. Boyd v. Terminal R. Ass'n, Mo., 289 S.W. 2d 33 [1, 3], 59 A.L.R.2d 1222; Klotsch v. P. F. Collier & Son Corp., 349 Mo. 40 (banc), 159 S.W.2d 589 [7].

We will describe plaintiffs' house and the parties' electrical facilities as they were before the fire, during the fire, and after the fire.

*Before the Fire.* The plaintiffs' three-bedroom, frame house was on a one-acre lot in a large tract subdivision. Mr. Lowes had built and wired the house himself; it was completed except for hanging the interior doors and the door to the basement garage. The house faced east and sat back from the road about a hundred feet. Under the northeast corner of the house there was a basement garage, its entrance facing the roadway. The basement wall on the north and east sides of the dwelling was made of concrete blocks, with an entry way into the garage. Just above the basement wall, the framework of the house extended one foot beyond the concrete wall and the underside of this overhang was lined with plywood. Along the front of the house, just below this overhang, Mr. Lowes had put up some temporary scaffolding so he could reach high enough to apply asbestos siding to the front of the house. Thus, the scaffolding rested against the basement wall and extended upward from the ground to the top of the basement wall.

At this northeast corner of the house, the defendant's power supply line joined

the plaintiffs' electrical system. Mr. Lowes had used power tools and a radio inside the house, and defendant had been furnishing electricity to the house for several months. The defendant's equipment consisted of a pole, a transformer, a three-wire power line, a hanger to attach the power line to the house, and three clip fasteners to attach defendant's power line to the wires of plaintiffs' distribution system. Plaintiffs' equipment, insofar as we are here concerned, consisted of a three-strand wire running through a metal conduit pipe fastened to the side of the house. To understand the parties' theories of the cause of the fire, we must describe the equipment in detail, beginning at defendant's pole and moving toward the interior of the house.

The defendant's pole was near the roadway, 104 feet from plaintiffs' house. Atop the pole was defendant's transformer. There are differences in transformers regarding cut-off devices to stop the flow of electricity from the transformer in the event of a short circuit. Some have circuit breakers and some have fuses; other transformers are purposely designed without any type of automatic cut-off device. The record does not disclose which type of transformer this was.

From defendant's transformer its power line extended under a tree in plaintiffs' front yard to a point under the eaves at the northeast corner of their house. This power line is called a triplex wire, consisting of two live, insulated wires braided around a neutral, uninsulated, weight-bearing wire. The triplex wire was suspended from plaintiffs' house by a foot-long hanger, through which its neutral strand passed. At one end of the hanger was a porcelain knob, attached to the house. At the other end of the hanger was an aluminum clamp, consisting of a base and a compression slide. The neutral strand of the triplex wire—but not the energized strands—ran through this clamp and was held in place by pressure exerted between the base and the movable compression slide. Hence, the weight and tension of defendant's power line was supported by its pole at one end and by its hanger on plaintiffs' house at the other end. Four feet beyond defendant's hanger was the upper end of plaintiffs' conduit, a metal pipe attached to the side of the house. The defendant's triplex wire extended two or three feet beyond its hanger; plaintiffs' three wires extended two or three feet beyond the top of the conduit. The two sets of wires looped toward each other, and midway in this loop each of the three strands of defendant's triplex wire was attached by a clip fastener to each of the three similar strands of plaintiffs' wiring system. At the plaintiffs' end of this loop, plaintiffs' three strands of wire entered their conduit, extended downward through the conduit and followed a bend of the conduit through the basement wall, where the two live strands were attached to plaintiffs' fuse box inside the garage. These were the physical elements that existed before the fire.

*The Fire.* The day of the fire was warm, windy and dry. There were "a lot of leaves" on the ground around plaintiffs' house. About 6 p. m., several neighbors noticed a fire at plaintiffs' house. Three of them testified: When they arrived at the scene, the whole inside of the house was ablaze and smoke, flames, and pieces of burning wood were coming out of bursted windows and doors. The fire was burning most intensely at the northeast corner of the house. (It was here that the defendant's triplex wire and plaintiffs' lead-in conduit had been attached. Here, also, was the open doorway into the basement garage.) This northeast corner of the house had "fallen off," the exterior wiring had been severed, and the burnt end of defendant's triplex wire, still energized and flashing, was lying somewhere in the yard amid burning leaves. The defendant's transformer was buzzing and showing a red signal light, until defendant's lineman arrived, climbed the pole, and disconnected the transformer. No witness testified about the condition of plaintiffs' electrical

equipment during the fire, nor when or whether the plaintiffs' scaffolding burned.

*After the Fire.* Other material evidence concerned the cause and effect of short circuits, the mechanical functions of the electrical equipment, and its condition after the fire. Mr. Lowes arrived at the house two hours after the fire had started. Then or later, he raked through the burnt debris and retrieved several pieces of electrical equipment. Mr. Lowes identified them at the trial and they were examined by plaintiffs' expert witness, Arthur Patridge, an electrician.

Mr. Patridge first testified in general terms about the cause and effect of short circuits in transmission lines: When a bare live wire comes in contact with another bare live wire or with any grounded conductor, intense heat is created at the point of contact, sufficient to sear the metal and to burn insulation from the wire. When this occurs in a triplex transmission wire, the electricity will no longer pass that point. Instead, the electricity moves backward toward the source until it reaches a point of tension in the wire; heat increases there, the insulation burns off, and another short circuit occurs. After the first short circuit occurs, there will be a series of short circuits moving backward along the transmission line toward the transformer.

Mr. Patridge examined and gave opinions about the various pieces of equipment plaintiff had retrieved from the debris. The severed part of defendant's triplex wire, which had extended from the transformer to the house, had several places where the insulation had burned off, indicating a series of short circuits moving backward toward the transformer. As mentioned earlier, the defendant's triplex wire had been suspended from the house by defendant's hanger, the neutral strand having been held in its aluminum clamp by pressure exerted between the base and the movable compression slide. After the fire, Mr. Lowes had found the movable compression slide deep in the debris and the rest

of the hanger atop the debris. The movable compression slide was partly melted. Mr. Patridge said the damage to the slide was probably caused by a short circuit, but added that it was "either an electrical burn or it is a burn from a very, very high temperature." By contrast, we have examined the base of the clamp, against which the compression slide had exerted pressure, and find no sign of either friction or burning. Mr. Patridge examined the plaintiffs' conduit pipe that had come loose from the side of the house. It bore drippings of melted roofing tar running from its base toward its top, indicating that the conduit had come loose from the house and was pointed downward before the house collapsed. Mr. Patridge also examined plaintiffs' Exhibit I, which Mr. Lowes had identified as the section of his wiring that had been connected with defendant's triplex cable and had extended through the conduit into plaintiffs' fuse box. Mr. Patridge identified two burnt places on this piece of plaintiffs' wire that had been caused by a short circuit or electricity. We quote:

> "Q. * * * Now, you, of course, having been in electricity for twenty years, wired some seven or eight hundred houses, you can tell an electrical burn on wire when you see it, can't you? A. Yes, I can. Q. Tell me whether or not you see any burns on this wire caused by a short or electricity? A. Well, this is. Q. All right. A. And that is."

Mr. Patridge's testimony was limited to these specific items; he gave no opinion as to the cause of the fire.

 As said, the plaintiffs submitted their case on the dual theory that the defendant had maintained its wires in such a manner that a short circuit occurred therein, and that defendant had maintained a defective transformer which failed to cut off the current. Plaintiffs submitted that in these two ways the defendant was negligent, and that such negligence caused

the fire. Plaintiffs correctly contend that negligence and causation may be proved circumstantially, citing Young v. Missouri Public Service Co., Mo., 374 S.W.2d 59. This rule, with its limitation, is stated in Miller v. Sabinske, Mo.App., 322 S.W.2d 941 [5, 6]:

"As in non-fire cases, an essential issue [in fire cases] may be established by circumstantial evidence as well as by direct evidence. * * * The circumstantial evidence while not directly proving the existence of the fact must give rise to a logical inference that it exists. [Citing cases.]

"Since there was no eyewitness as to how the fire on plaintiffs' premises occurred, the circumstantial evidence must be sufficiently strong to indicate to reasonable minds the source and cause of the fire and defendant's responsibility therefor and not leave those questions to mere conjecture, guesswork or speculation. The evidence should reasonably eliminate the probability of any other source and cause. [Citing cases.]"

Plaintiffs also cite the case of Reichholdt v. Union Electric Co., Mo., 329 S.W.2d 634, referring "to the general rule that suppliers of electricity must use the highest degree of care to keep their wires in such condition as to prevent injury to persons who may lawfully be in close proximity thereto." That case further held, at l. c. 638, that the defendant could not be held liable for fire damage caused by defects in the plaintiffs' own household wiring.

The defendant vigorously contends that the plaintiffs' evidence failed to show (1) prior defects in its equipment, or (2) that the fire was caused by its equipment. It relies primarily on the principle announced in the case of Craddock v. Greenberg Mercantile, Inc., Mo., 297 S.W.2d 541 [3, 4], where the Supreme Court said:

"The mere occurrence of a fire does not prove, or raise a presumption of, negligence. [Citing cases.] Likewise, the mere occurrence of a fire raises no presumption as to its cause, generally. * * And there must be substantial evidence on both negligence and causation to make a submissible case."

In the light of these principles, we will examine plaintiffs' evidence on each of their submissions.

*Plaintiffs' Submission as to Defendant's Wires and Hanger.* First, we will examine plaintiffs' contention that the evidence showed that defects in the defendant's wiring caused the fire.

Their basic contention is that the defendant's triplex wire "sagged excessively," causing it to sway in the wind so that the insulation was worn off at the point where it was grasped by the defendant's hanger near the corner of their house, thus causing the initial short circuit; that this short circuit melted the movable compression slide of the hanger, thereby releasing the pressure and allowing the slide and the triplex wire to fall. From this premise, plaintiffs advance two conclusions. First, they say that the heated slide fell to the ground and ignited leaves which were piled around the scaffolding; that the leaves ignited the scaffolding, which set fire to the house at the place where the overhang extended above the scaffolding. Alternatively, the plaintiffs say that when the movable slide melted, this released the defendant's triplex wire from the clamp; that the triplex wire pulled the conduit loose, fell to the ground, and ignited either the leaves or the scaffolding, thus firing the house. The defendant urges us to note the weak links in this chain of reasoning:

It first attacks the plaintiffs' basic premise that the initial short circuit was at defendant's hanger. It does accept plaintiffs' theory that a series of short circuits moves backward from the first short circuit toward the source of the current, but points out that there were two electrical burns or short circuits in plaintiffs' own wire in the conduit attached to plaintiffs'

house. Mr. Patridge so testified. Defendant says this shows that the first demonstrable short circuit occurred in plaintiffs' wiring, not defendant's. It further contends that the evidence failed to show there ever was a short circuit at its hanger. It emphasizes this evidence: (1) The clamp of the hanger grasped only the neutral strand of its triplex wire, not the energized insulated wires. (2) The base of the clamp, against which the movable slide compressed the neutral strand, showed no marks of friction or burning, which would have occurred if there had been a short circuit at the hanger. (3) The partly melted compression slide was found underneath burnt debris, and Mr. Patridge said alternatively that its melted condition indicated either an electrical burn or a burn from a very high temperature. Further, defendant argues that the plaintiffs' alternative conclusions are without evidentiary support. It points to absence of evidence to show that (1) there was excessive sagging of its power line or that it swayed, (2) leaves were piled around the scaffolding, or (3) the scaffolding was burning either before or during the house fire.

The defendant argues that the evidence more logically supports two other conclusions: the fire started from a short circuit in plaintiffs' own wiring near their conduit; or the burning of the house caused the initial short circuiting, rather than the short circuiting caused the fire. We do not recite this argument to imply that defendant had any duty to disprove causation, but only to emphasize the dual burden cast upon plaintiffs when they rely on circumstantial evidence. Their evidence must logically point to the source and cause of the fire and defendant's responsibility therefor, without relying on speculation; it must also reasonably eliminate the probability of any other source and cause. Miller v. Sabinske, supra; Craddock v. Greenberg Mercantile, Inc., supra.

Thus, plaintiffs were required to show by a logical sequence of cause and

effect that a defect in the defendant's wires or hanger caused the fire. Plaintiffs' evidence not only failed to show that the initial short circuit was in defendant's wiring, it more logically showed that its origin was in their own wiring. Plaintiffs were not entitled to go to the jury on this submission. Since they failed to show the element of causation, we need not consider defendant's additional contention that plaintiffs' evidence failed to show that defendant was negligent.

*Plaintiffs' Submission as to Defendant's Transformer.* We will now consider plaintiffs' conjunctive submission that defendant maintained a transformer which was defective because it failed to cut off the electricity when the initial short circuit occurred, and that defendant's negligence in doing so caused the fire. This is based on plaintiffs' contention that the defendant had a duty to furnish a transformer equipped with an effective fuse or circuit breaker, and that it negligently failed to do so.

No witness described the defendant's transformer or said whether it was equipped with a fuse or a circuit breaker. We have only Mr. Patridge's statement that some transformers have fuses, some have circuit breakers, and some have neither. We do not know which of the three types of transformers this was.

No case has been cited referring to the duty of a supplier of electricity to equip its transformers with fuses or circuit breakers. Plaintiffs cite the case of Reichholdt v. Union Electric Co., supra, in which there was nondecisive testimony that the fuses in defendant's transformer were too heavy. But the defendant there was exonerated on other grounds. Plaintiffs also cite cases annotated at 32 A.L.R.2d 265 et seq., but those cases are not in point. They do not concern transformers; instead, they deal, pro and con, with the duty to have circuit breakers in high-tension lines running over public streets. We need not rule on the general duty of an electrical sup-

plier to equip its transformers with cut-off devices. A judicial determination of that question should wait until it arises in a case where the evidence is fully developed. Our ruling is merely that the evidence disclosed no duty by this defendant to these plaintiffs to equip its transformer with an automatic cut-off device.

■ Even if we were to assume such a duty, plaintiffs' case would fail because there was no evidence of negligence. As said by Judge Bennick, speaking for this court in Monsour v. Excelsior Tobacco Co., Mo.App., 115 S.W.2d 219 [3]:

> "* * * and it is also true that, where the negligence relied upon consists of some defect in an instrumentality or device which the defendant has the duty to maintain in a proper condition, the latter is ordinarily not to be charged with negligence for his failure to have remedied the defect unless it is shown that he had actual or constructive knowledge of the same in time to have made the necessary repairs before the occurrence of the accident. 45 C.J. 660."

We hold that plaintiffs' evidence failed to show that defendant negligently maintained a defective transformer. They were not entitled to go to the jury on this submission.

■ The defendant's after-trial motion for judgment in accordance with its motion for a directed verdict under § 510.290, V.A.M.S., raised the question of whether the plaintiffs made a submissible case on their two submitted assignments, and our inquiry on this appeal is so limited. Schmidt v. Allen, Mo., 303 S.W.2d 652 [9]; Farmer v. Taylor, Mo.App., 301 S.W.2d 429 [9]. Having concluded that plaintiffs' evidence failed to show that the fire was caused by defectively maintained equipment, the cause must be reversed and remanded, with instructions to enter judgment for the defendant.

PER CURIAM.

The foregoing opinion of CLEMENS, C., is adopted as the opinion of this court. Accordingly, the judgment is reversed and the cause is remanded with instructions to enter judgment in favor of the defendant.

WOLFE, P. J., and ANDERSON and RUDDY, JJ. concur.

PER CURIAM.

Plaintiffs contend that we have overlooked critical evidence. They say this evidence shows that the two short-circuit burns on the lead-in triplex wire were on *defendant's* end of that wire, not on plaintiffs' end as we said in our opinion. Plaintiffs stress two questions and answers in the testimony of Mr. Arthur Patridge, plaintiffs' electrical expert. This testimony was linked to Mr. Lowes' identification of the wires, so we will set out the testimony of both witnesses and for clarity will add emphasis.

As said, Mr. Lowes had salvaged some electrical equipment from the debris. Then, on direct examination:

"Q. Now I'll show you what's been marked Plaintiff's Exhibit I, and ask you to identify this.

"A. *That's the cable that came out of the conduit.*"

Thus, Exhibit I was identified as being plaintiffs' own triplex wire. Then, Mr. Patridge was questioned:

"Q. * * * Now, I want to show you here what's been marked Plaintiff's Exhibit I, and it's been identified, Mr. Patridge, as being that portion of the wire from here over *into the meterhead and down through into here.* This has been identified as being that wire. Now, you, of course, having been in electricity for twenty years, wired some seven or eight

hundred houses, you can tell an electrical burn on wire when you see it, can't you?

"A. Yes, I can.

"Q. Tell me whether or not you see any burns *on this wire* caused by a short or electricity?

"A. Well, this is.

"Q. All right.

"A. And that is."

This testimony led us to conclude that the two identified short-circuit burns were on plaintiffs' end of the triplex wire. Plaintiffs contend we have disregarded the next two questions and answers which, they say, show that the short-circuit burns were on the defendant's end of the triplex wire:

"Q. Okay. Now, those two that you pointed to there have been identified as being the ends on the other side of the quick fasteners that led up to this fastener hookup, right here?

"A. Uh huh.

"Q. Now, outside of those burns which you said are electrical burns on there, tell me if you find any other shorts or electrical burns anywhere in that assembly?

"A. No, there's no other in it."

We cannot so construe these two questions. The words "have been identified" could refer only to Mr. Lowes' identification of Exhibit I as being the triplex wire that came out of plaintiffs' conduit. The words in counsel's question, "the ends on the *other side* of the quick fasteners that led up to this fastener hookup," are ambiguous. Plaintiffs now say: "The expert had, of course, pointed out the two electrical shorts on the ends of the wires on the other side of the quick fasteners, the ends on Union Electric's side of the quick fasteners which were next to its fastener-hanger hook-up, the point where the initial short occurred." We cannot determine from the transcript where counsel was pointing

or where the witness was looking when these questions were asked and answered. The words "here", "there" and "other side" are meaningless in themselves. During the heated conflict of a trial, ardent advocates are often inclined to assume that we will get the same detailed picture they are witnessing. Not so; our knowledge of what happened in the courtroom is limited to what we read in the transcript. Baker v. Missouri National Life Ins. Co., Mo.App., 372 S.W.2d 147 [11, 12]. Plaintiffs' conclusion is not supported by the transcript.

Plaintiffs urge us to re-examine Exhibit I, saying it will show that the short-circuit burns are on defendant's end of the triplex wire. The exhibit is a mass of charred wires. It does (contrary to Mr. Lowes' identification) appear to be composed of not only plaintiffs' triplex wire, but also 18 inches of defendant's end of the triplex wire. Mr. Patridge did not mark the exhibit at the places he identified as short-circuit burns; we do not know where counsel and Mr. Patridge were pointing or looking when they did so. We cannot assume the expert's role of distinguishing short-circuit burns. Assuming, arguendo, that Mr. Patridge did identify the ends of this eighteen-inch section of defendant's wires as the location of short-circuit burns, still there is nothing to show that this was the place where defendant's hanger grasped its wires. We have again read the transcript. It is sprinkled with references to exhibits, made without marking or verbally identifying the places to which counsel or the witnesses were referring. Neither the transcript nor the exhibits support plaintiffs' basic contention that there was a short-circuit burn at the place where defendant's hanger held its end of the triplex wire.

The record preserved does not support plaintiffs' contention.

We have assumed, arguendo, that plaintiffs *are* correct and that there *were* two short-circuit burns near the end of defendant's wires. We have re-examined our

opinion in that light. The whereabouts of the initial short circuit is but one of the links in the chain of circumstances by which plaintiffs tried to show that their home was destroyed by defendant's negligence. As pointed out in our original opinion, plaintiffs further failed to show that this particular short circuit was *caused* by any excessive sagging in defendant's line, or that it *resulted in* igniting the leaves or scaffolding beneath plaintiffs' house. The assumption would not change the result of our opinion.

The motion for rehearing or to transfer is denied.